UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

NAILAH ALAKA-MUHAMMAD,           )
                                 )
              Plaintiff,         )
                                 )
       v.                        )        No. 1:15-cv-01495-SEB-MPB
                                 )
MARION COUNTY JUVENILE           )
DETENTION CENTER,                )
                                 )
              Defendant.         )

## **MEMORANDUM ORDER**

Plaintiff Nailah Alaka-Muhammad ("Muhammad") brought this action against her

former employer, defendant Marion County Juvenile Detention Center ("the Detention

Center"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

("Title VII"), and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (ADA).

Before the Court is the Detention Center's motion for summary judgment. Dkt. 55. For

the reasons below, the motion is granted.

## **Facts and Procedural History**

With all evidentiary conflicts resolved and all reasonable inferences drawn in

Muhammad's favor, the parties' designated materials reveal the following. The Detention

Center is an arm of the Juvenile Division of Marion Superior Court in Marion County,

Indiana. In May 2009, the Detention Center hired Muhammad for the position of "Youth

Manager." Dkt. 57 Ex. B. In late 2013, Muhammad's job title changed to "Central

Control Staff" or "Central Control." *Id.* Exs. A, G to I. It does not appear from the record

whether this change in title reflected a change in duties, nor, if so, whether such change represented a promotion, a demotion, or neither. After working at the Detention Center for five years, Muhammad was informed by letter dated May 14, 2014, that she was being terminated from her employment with the Detention Center effective May 15, 2014.

Muhammad is a middle-aged woman who, during the time she worked for the Detention Center, suffered from several physical and mental ailments. Specifically, Muhammad suffered from diabetes, high blood pressure, blood clots, and nagging injuries to her shoulder and knee, as well as from both depression and anxiety. At one time Muhammad had received testing for a brain disease, but the test did not lead to a diagnosis and Muhammad did not pursue treatment. Over the course of Muhammad's employment, the Detention Center was aware of at least some of Muhammad's ailments, based in part on the periods of medical leave she had taken to address the blood clots and her possible brain disease.

During her time as an employee of the Detention Center, Muhammad accumulated a checkered disciplinary record, partly justified and partly not. Muhammad's first disciplinary sanction came on October 21, 2009, less than six months after she had first been hired, when she was "counsel[ed]"[1] for failing to follow Detention Center protocol in responding to an aggressive inmate. Dkt. 57 Ex. B.

---

[1] "Counseling" is the lowest level of discipline in the Detention Center's progressive discipline policy. *See* Dkt. 57 Exs. B to I ("Corrective Action Record[s]").

On November 1, 2009, Muhammad received a five-day suspension[2] for failing to properly supervise a group of inmates in her charge. This suspension appears to have been unjustified, however, as Muhammad was required to supervise twice as many inmates (sixteen) as was required of other staff members, who supervised eight, according to Detention Center policy or practice. Moreover, Muhammad's supervisor faulted her for entering an inmate's room and nearly shutting the door behind her, though Muhammad asserts that the door was "nowhere near closed." Muhammad Dep. (Dkt. 59 Ex. 1) 126:21. Muhammad asked her supervisor for "either proper training or assistance" in supervising so many inmates, explaining that she felt "overlook[ed] and not utilized" to the full extent of her ability. Dkt. 57 Ex. C. Apparently her request went unheeded.

On December 16, 2009, Muhammad was counseled for failing to correctly perform an assignment. Specifically, Muhammad was given a bag of potato chips to pass around as a reward to a group of inmates. Instead, Muhammad poured out some of the chips for herself, ate them, and, as it was the end of her shift that day, left the Detention Center without distributing the chips to the inmates.

On June 8, 2010, Muhammad received a "1st Written Warning" for leaving an inmate in his room while she escorted others to the cafeteria, a violation of Detention Center policy in several respects. Dkt. 57 Ex. E.

---

[2] Suspension is the highest level of discipline short of termination in the Detention Center's progressive discipline policy. *See* Dkt. 57 Exs. B to I. Why Muhammad's discipline was immediately raised to this level does not appear from the record.

On October 5, 2011, Muhammad received a second "1st Written Warning" for her frequent lateness in arriving at work. Dkt. 57 Ex. F. Muhammad's attendance record reflected that she had been late to work six times in thirty days.

On November 14, 2013, Muhammad received a "2nd Written Warning" (technically, Muhammad's third written warning), Dkt. 57 Ex. G, for her conduct on November 9, 2014. On that day, a group of people arrived at the Detention Center to attend a scheduled program. Muhammad was unaware of any scheduled program and unable to confirm such with on-duty Detention Center staff. Muhammad asked "Ms. Williams," apparently one of Muhammad's supervisors, Muhammad Dep. (Dkt. 59 Ex. 1) 149:1, whether Muhammad should call the Detention Center employee responsible for programming to inquire, though the employee was off duty that day and at home mourning the recent death of a family member. "Ms. Williams" replied that Muhammad should place the call. That instruction contravened a September 3, 2013, directive from the Detention Center that "Central Control Staff should not call staff for any reason." Dkt. 57 Ex. G. Muhammad called the employee and discovered the program had been canceled. Sometime thereafter, Muhammad's phone call was characterized— inaccurately, says Muhammad—by the employee and a member of the clergy assisting the employee as "abrasive and overbearing . . . ." Muhammad Dep. (Dkt. 59 Ex. 1) 147:15. The same day, November 9, 2013, Muhammad reportedly also did not permit a "Supervisory Staff" person to "leave the floor to allow an employee to have their lunch break[,]" and inquired with a supervisor whether "there was schedule flexibility because 'a staff was not following the schedule.'" Dkt. 57 Ex. G. It does not appear from the

record how this conduct constituted violations of Detention Center policy, as charged in the November 14, 2013, "2nd Written Warning." *Id.* When Muhammad signed the written notice of the warning, she wrote "under duress" by her signature. *Id.*

On December 3, 2013, Muhammad received a one-day suspension for using an "insubordinate" "tone" with her supervisor which the supervisor thought "display[ed] malicious intent." Dkt. 57 Ex. H. On Friday, November 22, 2013, Muhammad had arranged with a colleague who worked the night shift for the colleague to work longer than scheduled on the following morning to cover for Muhammad, who worked the day shift, while she took her daughter to a doctor's appointment. In exchange, Muhammad agreed to stay later the same evening, so that the colleague could come in later than usual. Muhammad's supervisor e-mailed the colleague to confirm their arrangement, and then e-mailed Muhammad, allegedly falsely claiming that the colleague "will only be able to stay an hour" past the end of her shift, until 6:30 a.m. *Id.* Muhammad replied, "That is fine sir, I will call off and she [the colleague] can be mandated[,]" *id.*, that is, required by the Detention Center to stay up to four hours past the end of her shift in the absence of other available employees to relieve her. Muhammad Dep. (Dkt. 59 Ex. 1) 134:12–15. Muhammad's supervisor interpreted "[t]he tone of [her] response above [to be] insubordinate and [to] display[] malicious intent." Dkt. 57 Ex. H. When Muhammad signed the written notice of her suspension, she added the words, "This is harrassment." *Id.* (*sic*).

Muhammad's perception of duress and harassment was tied to the fact that she had filed at least one charge of discrimination with the Indianapolis office of the Equal

Employment Opportunity Commission (EEOC) in 2013. Muhammad viewed the unjustified or disproportionate disciplinary actions of November 14, 2013, and December 3, 2013, as the Detention Center's retaliation against her for contacting the EEOC in 2013.

Muhammad continued to experience what she viewed as harassment. On February 5, 2014, Muhammad observed a coworker, "Mr. Mills," "being inappropriate towards [a] girl" at the Detention Center's reception desk. Muhammad Dep. (Dkt. 59 Ex. 1) 80:24–81:4. After speaking with a supervisor, Muhammad submitted a written report of the incident on February 6, 2014. In an e-mail to Detention Center management on March 16, 2014, Muhammad described what happened next:

> When I return[ed] back to work on February 10 or 11, 2014 the person whom [supervisors] wrote up walk[ed] pass control [where Muhammad was working] and hit the window with force and stood there staring at me[. H]e then took a few steps again hitting the window with force[.] I felt as though he was trying to intimidate me and his behavior afterward [was] harassing.

Dkt. 59 Ex. 4. Muhammad's frustrations prompted her plea for help:

> [I]n my 40 plus years of working I have never felt so disrespected or mistreated; my spirits are broken and I can't seem to find my way back[.] I am both emotionally and mentally drain[ed] and before it becomes any more physical I know for certain I need help (therapy). Any[one's] assistance is needed.

*Id.* It does not appear that Muhammad received any assistance from the Detention Center or its staff in response to this request.

Muhammad's final disciplinary citation was dated May 5, 2014 ("the May 5 disciplinary record"). Unlike the previous instances summarized above, this record was not signed either by Muhammad or her supervisor. It consists of three violations of Detention Center policy; none of the allegations was accurate, says Muhammad. The first allegation related to a complaint, dated April 29, 2014, submitted by a Detention Center employee describing Muhammad's unacceptable conduct on April 27, 2014. Muhammad allegedly had told the employee, "Yes, I have a problem and it's you and anybody else here trying to trying to tell me my job. I know my job very well." Dkt. 57 Ex. J. The second occurrence related to a complaint, dated April 30, 2014, describing Muhammad's conduct "on the date reported . . . ." Dkt. 57 Ex. K. On that day, Muhammad allegedly said of a Detention Center employee in profane terms that she had a "MENTAL PROBLEM!!" and "look[ed] like one of those people that make they self throw up!!" *Id.* (*sic passim*). But Muhammad's time sheet for that day reflects that she did not work on April 30, 2014. The third violation related to a complaint, dated May 7, 2014, describing Muhammad's conduct on May 5, 2014, the date appearing on Muhammad's final disciplinary record. That complaint alleged that Muhammad had been "rude," "disrespectful," and "rough" with a Detention Center trainee. Dkt. 57 Ex. I.

The May 5 disciplinary record noted that, "[d]ue to the nature of the above violations, [Muhammad's] employment has been terminated effective immediately." Dkt. 57 Ex. I. Muhammad, though at work on May 5 and 6, 2014, does not appear to have learned of the May 5 disciplinary record or its contents on either of those days. Muhammad was not at work on May 7 or 8, 2014. On May 9, 2014, Muhammad took

medical leave from the Detention Center to address her emotional health; Muhammad's physician and therapist recommended that she not return to work until May 23, 2014. Also on May 9, 2014, Muhammad filed a new charge with the EEOC ("the May charge"), alleging that the Detention Center had retaliated against her for filing her previous EEOC charges by imposing the November 2013 and December 2013 disciplinary sanctions, and that she had been subjected to a hostile work environment through the harassment of "Mr. Mills" and another coworker, "Mr. Powell." Dkt. 57 Ex. N.

The human resources director for the Detention Center scheduled a meeting with Muhammad on May 8, 2014, to discuss "a matter of [her] inappropriate conduct while at work." Dkt. 57 Ex. M. Muhammad did not attend that meeting, however, because she had been told it needed to be rescheduled. A second meeting was scheduled for May 14, 2014, but Muhammad was never informed of it and thus did not attend. On or about the same day, Muhammad had her daughter deliver to the Detention Center certain documents, including a letter from Muhammad's physician recommending that Muhammad take leave from work and time sheets showing that Muhammad had not been at work on at least one of the dates mentioned in the May 5 disciplinary record.[3] On May

---

[3] This implies that sometime between May 5 and May 14, 2014, Muhammad learned the contents of the May 5 disciplinary record, but the designated evidence does not disclose precisely how or when she did so. *See* Muhammad Dep. (Dkt. 59 Ex. 1) 158:10–159:25 ("I had sent someone to take it up there, my documents showing that I wasn't working. . . . I sent them the copy of the doctor statement."). Muhammad also testified that she personally delivered documents authenticating her leave to the human resources director, *id.* at 112:22–113:13, but she could not remember when. *Id.* at 113:2, 18–20.

14, 2014, the human resources director e-mailed Muhammad requesting again to meet with her, but received no response. The staffer then mailed Muhammad a letter, dated May 14, 2014 ("the termination letter"), noting that, "[a]s of May 15, 2014," Muhammad had not "appeared for a meeting or confirmed a meeting time." Dkt. 57 Ex. M. The termination letter notified Muhammad that her "employment with the Marion Superior Court Juvenile Detention Center ha[d] been terminated effective May 15, 2014." *Id.*

Muhammad cites the disciplinary record of another Detention Center employee, LaKeshia Anderson ("Anderson"),[4] as similar in content and volume to hers. Over the course of Anderson's nearly three years of employment at the Detention Center, Anderson received nine disciplinary sanctions for lateness and absenteeism, unprofessional and profane language, and dishonesty in connection with a work-related injury and the Detention Center's accommodation of it. On January 23, 2015, Anderson was scheduled to meet with the human resources director and Anderson's supervisor (who had also been Muhammad's supervisor). The intention was to fire Anderson at that meeting, but she did not attend, having disclosed to the human resources director the previous day that she would not attend the meeting nor return to the Detention Center. When Anderson did not appear for her regularly scheduled shifts on January 24 and January 25, 2015, the Detention Center concluded based on her "no call[]/no show[s]" that Anderson had quit. Dkt. 61 Ex. R ¶ 10. Anderson did not suffer from any disability

---

[4] Anderson's first name is also given as "Lakeshia" and as "Lakeisha," sometimes in the same document. *See, e.g.,* Dkt. 59 Ex. 6, at 6.

and did not file any EEOC charges during or after her employment at the Detention Center.

On July 23, 2014, Muhammad filed another charge with the EEOC ("the July charge"). Therein she reiterated the allegation set out in the May charge that she had been subjected to a hostile work environment by the harassment of "Mr. Mills," and newly alleged that she had been fired while on disability leave in retaliation for past complaints, including the May charge. The EEOC issued Muhammad a right-to-sue notice on the July charge on June 30, 2015. On September 23, 2015, Muhammad filed her complaint in this Court, alleging that her firing was unlawful retaliation for protected activity under Title VII and unlawful discrimination on the basis of disability under the ADA. The Detention Center moved for summary judgment on April 17, 2017. The motion is now fully briefed and ripe for decision.

## Standard of Decision

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## Analysis

We take up Muhammad's Title VII retaliation claim first, followed by her ADA discrimination claim.

## I.   Title VII Retaliation

As an initial matter, both parties agree in terms of the timeliness issue, that Muhammad's Title VII claim necessarily relates to the July charge.[5] Further, both parties agree that the claim must be limited to matters newly alleged in the July charge, thereby excluding allegations in the July charge that duplicated the May charge. *Ervin v. Purdue Univ. Calumet*, No. 2:09-cv-136, 2010 WL 3021521, at *4 (N.D. Ind. July 28, 2010) (timely suit on EEOC charge may not simply restate allegations of earlier, time-barred EEOC charge). Accordingly, Muhammad is not entitled to recover for any retaliation against her based on claims that she was harassed by her coworkers "Mr. Mills" and "Mr. Powell," or received unjustified disciplinary sanctions in November 2013 and December 2013. Def.'s Br. Supp. Mot. Summ. J. (Dkt. 56) 6. Muhammad's claim thus reflects only her May 2014 firing as support for her retaliation claim. Pl.'s Br. Opp. Mot. Summ. J. (Dkt. 58) 8. We limit our analysis accordingly.

Title VII prohibits an employer from retaliating against an employee for complaining of employment practices made unlawful by Title VII. 42 U.S.C. § 2000e-

---

[5] A Title VII action must be filed within 90 days of receiving a right-to-sue notice from the EEOC. 42 U.S.C. § 2000e-5(f)(1); *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 849–50 (7th Cir. 2001). Muhammad received a right-to-sue notice on the May charge on July 16, 2014. This lawsuit was filed on September 23, 2015, more than 90 days later. Any action on the May charge is therefore foreclosed as untimely.

3(a). "[A] plaintiff may prove a retaliation claim through either the direct or indirect methods of proof," *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016), on the understanding that these methods of proof are just that—"just means to consider whether one fact . . . caused another"—without establishing "different legal standards." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 763, 765 (7th Cir. 2016). "Muhammad proceeds under the direct method to establish retaliatory discharge[,]" Pl.'s Br. Opp. 8, that is, without the aid of the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ortiz*, 834 F.3d at 766.

Under the direct method, Muhammad must show that "(1) [s]he engaged in protected activity, (2) [s]he suffered an adverse employment action, and (3) there was a causal connection between the two." *Poullard*, 829 F.3d at 856. The Detention Center concedes the first two elements: Muhammad's filing of the May charge was protected activity and Muhammad's May 2014 firing was an adverse employment action. Def.'s Br. Supp. 6. But, argues the Detention Center, "the two are not related" occurrences, and no reasonable trier of fact could find a causal connection between them on this record. *Id.* at 6–7.

To prove a causal connection "requires 'proof that the desire to retaliate was the but-for cause of the challenged employment action[,]'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —U.S.—, 133 S. Ct. 2517, 2528 (2013)); in other words, proof that the adverse employment action would not have occurred in the absence of the desire to retaliate. *Nassar*, 133 S. Ct. at 2525. Like any fact, causation may be proved by direct or

circumstantial evidence, alone or in combination, *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006), and such evidence is to be evaluated on equal terms. *Ortiz*, 834 F.3d at 765. Even individually weak or ambiguous pieces of circumstantial evidence may be sufficient proof when assembled to form a "convincing mosaic" of retaliation. *Ortiz*, 834 F.3d at 764; *Sylvester*, 453 F.3d at 903.

But, "absent a 'cat's paw' theory of liability[,]"[6] *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 733 (7th Cir. 2013), even the most convincing circumstantial evidence necessarily fails to support a retaliation claim unless it permits a reasonable inference that the employer's decision-maker on the adverse employment action had actual, not constructive, knowledge of the employee's protected activity. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004). In other words, "an employer cannot retaliate [against an employee for complaining] when it is unaware of any complaints." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000).

Here, the record before us does not directly establish or permit a reasonable inference that the Detention Center's decision-maker on Muhammad's firing had any knowledge of the May EEOC charge. Indeed, the record does not directly establish who the actual decision-maker was, though the termination letter was signed by the Detention

---

[6] "Cat's paw" liability may attach to the employer where an innocent decision-maker "acts as a conduit for [a] non-decisionmaker's bias" or other impermissible motive. *Byrd v. Ill. Dep't of Pub. Health*, 423 F.3d 696, 709 (7th Cir. 2005), *abrogated on other grounds by Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 425 n.12 (7th Cir. 2015). Muhammad has raised no such theory and we perceive in the record no grounds for doing so.

Center's human resources director, who averred that she "overs[aw] and [was] responsible for human resource matters" for the Detention Center. Dkt. 61 Ex. R ¶ 3.

No matter the identity of the decision-maker, the Detention Center points to the fact that the May 5 disciplinary record purported to terminate Muhammad's employment "effective immediately" on May 5, 2014, Dkt. 57 Ex. I, four days before Muhammad filed the May charge on May 9, 2014. Of course, an employer cannot reasonably be believed to have retaliated against an employee for an act she had not yet done. As Muhammad suggests, Pl.'s Br. Opp. 11, from the course of events between May 5, 2014, and May 15, 2014, and particularly from the fact that the termination letter, dated May 14, 2014, purported to "terminate[]" Muhammad's employment "effective May 15, 2014[,]" Dkt. 57 Ex. M, a reasonable fact-finder could conclude that the Detention Center did not actually fire Muhammad on May 5, 2014. But Muhammad does not dispute that the May 5 disciplinary record embodied the Detention Center's settled *decision* to fire Muhammad, four days prior to the date on which she filed the May charge.[7]

In any event, none of the designated evidence suggests that any Detention Center staff person, not to mention the actual decision-maker regarding Muhammad's firing (whoever she may be), knew of the May charge before May 15, 2014,[8] the *terminus ante*

---

[7] The unrebutted evidence establishes, as explained further below, that the Detention Center similarly reached the decision to fire Anderson days before making her termination effective, attempting to schedule a meeting with her during the interim.

[8] It may be speculated that someone at the Detention Center was informed of the May charge before May 15, 2014, as employers are statutorily entitled to notice of an EEOC charge filed against them within 10 days of filing. *Edelman v. Lynchburg College*, 535 U.S. 106, 119 (2002) (citing 42 U.S.C. §§ 2000e-5(b), (e)(1)). And, more specifically, it may be speculated that the decision-maker on Muhammad's firing was informed of the May charge by this means. But

*quem* of the Detention Center's settled decision to fire Muhammad.[9] Nothing in the termination letter suggests that the human resources director was aware of the May charge. Nothing in the excerpts of Muhammad's deposition designated by either party suggests that Muhammad delivered a copy of the May charge to the Detention Center after beginning her leave or otherwise made anyone at the Detention Center aware that she had filed or was planning to file the May charge. No reasonable trier of fact, therefore, could find on this record that the Detention Center's decision-maker on Muhammad's firing had actual knowledge of Muhammad's filing the May charge before she was fired.[10]

Even assuming the Detention Center had actual knowledge of the May charge, however, Muhammad's retaliation claim still cannot survive summary judgment. "Without direct evidence of causation,[11] [Muhammad] must rely on circumstantial

---

because "the jury may not render a verdict based on speculation or guesswork[,]" *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946), "guesswork and speculation are not enough to avoid summary judgment." *Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 692 (7th Cir. 2014) (quotations omitted).

[9] The termination letter is dated May 14, 2014, but notes that, "[a]s of May 15, 2014," Muhammad had not appeared for scheduled meetings or rescheduled them. Dkt. 57 Ex. M. One of the two dates must be mistaken: if the letter was written on May 14, its author could not know the situation as of May 15. A reasonable fact-finder could conclude that the termination letter was written on May 15, 2014, and simply misdated.

[10] Neither party fully addresses this material fact head on. The Detention Center argues only that its decision-maker "could not have had actual knowledge of the protected activity because it had not yet happened" on May 5, 2014. Def.'s Br. Supp. 8. In response, Muhammad asserts only that she was not in fact fired until May 15, 2014. Pl.'s Br. Opp. 10. Even so, raising the issue of actual knowledge leads inevitably to our conclusion here.

[11] "[D]irect evidence 'essentially requires an admission by the decision maker that his actions were based on the prohibited animus' and so is rarely present." *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005) (quoting *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). It is not present here.

evidence like suspicious timing, ambiguous statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation." *Burton v. Bd. of Regents*, 851 F.3d 690, 697 (7th Cir. 2017); *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) (suspicious timing, different treatment of similarly situated employees, pretextual reasons for adverse employment action). Muhammad points to three pieces of such evidence; none is persuasive, singly or in combination.

Muhammad points first to the close temporal proximity of her filing the May charge on May 9, 2014, and her firing on May 15, 2014. We agree that, in a vacuum, a mere six-day gap between protected activity and adverse employment action could raise an inference of causative retaliatory motive. "The closer two events are, the more likely that the first caused the second." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). But the evidence is not to be evaluated in a vacuum, *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) ("determination 'depends on context'" (quoting *Loudermilk*, 636 F.3d at 315)), and the ultimate question is not whether the timing is close, but whether the timing is suspicious, that is, whether it "contributes to an inference of causation." *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005).

The period from May 9, 2014, to May 15, 2014, cannot, on this record, reasonably be taken as discrete, self-contained, and unconnected to any prior events. Rather, it can only reasonably be taken as the final scene in a drama that began, at the latest, on December 3, 2013, when Muhammad received her second suspension (after three written warnings) for violating Detention Center policy, opening the door to the severest sanction

in the Detention Center's progressive discipline policy, termination. Further, even if we were to accept that Muhammad was not in fact fired on May 5, 2014, the May 5 disciplinary record permits no other inference than that its author thought that Muhammad's firing was warranted on that day "[d]ue to the nature of the violations" alleged therein. Dkt. 57 Ex. I. *Compare Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (suspicious timing sufficient to create triable issue in "extreme case" where termination recommended "the very day *after*" employee engaged in protected activity (emphasis added)). Finally, the human resources director attempted to meet with Muhammad on May 8, 2014, to discuss "a matter of [her] inappropriate conduct while at work[,]" Dkt. 57 Ex. M, and made two additional attempts to meet with Muhammad thereafter.

In light of the long-running process that led to Muhammad's firing, any reasonable inference that the May charge was the but-for cause of Muhammad's firing which a fact-finder might draw from their close temporal proximity would be particularly weak. Because Muhammad's other evidence, as explained below, raises no reasonable inferences of retaliation, her suspicious-timing evidence must stand on its own. But it is well established that "mere temporal proximity . . . will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). So isolated and deprived of external support, Muhammad's suspicious-timing evidence is by itself insufficient to create a triable issue on causation.

Muhammad points next to Anderson, whom Muhammad asserts to be a similarly situated Detention Center employee who did not file an EEOC charge against the

Detention Center or engage in other activity protected under Title VII, and who was treated more favorably than Muhammad. Though "our case law does not provide any 'magic formula for determining whether someone is similarly situated[,]'" *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (Section 1981 claim) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001) (equal protection claim)), and instead "emphasize[s] that the . . . inquiry is a flexible one that considers 'all relevant factors, the number of which depends on the context of the case[,]'" *id.* (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) (ADEA claim)), we need not engage in such a fine-grained inquiry here, for it is clear that Anderson did not in fact receive more favorable treatment than Muhammad.

The Detention Center's unrebutted evidence reveals that, on January 22, 2015, Anderson was slated for termination due to poor performance and violations of Detention Center policy at a meeting scheduled for January 23, 2015. Anderson informed the human resources director that she would not attend the meeting and would not return to the Detention Center. When Anderson showed up neither for the meeting nor her next two regularly scheduled shifts, the Detention Center deemed her to have quit. The mere fact that the end of Anderson's employment at the Detention Center was recorded and characterized as a "Voluntary Separation," Dkt. 59 Ex. 6, at 2, as opposed to a termination, *see* Pl.'s Br. Opp. 11, cannot be characterized as treatment more favorable than Muhammad received. There is no evidence that Anderson was informed of her pending firing beforehand or permitted the option to quit rather than be fired. As noted above, Muhammad does not contest that the Detention Center had decided to fire

Anderson before Anderson quit. Accordingly, Anderson's case cannot "help[] isolate the critical independent variable"—Muhammad's protected activity—and so does not raise an inference of retaliation. *Humphries*, 474 F.3d at 405.

Muhammad points finally to the allegedly pretextual grounds given by the Detention Center for her firing. Title VII "does not require employers to have 'just cause' for sacking a worker, but an employer who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pretext" for retaliation. *Loudermilk*, 636 F.3d at 315 (citation omitted). Pretext is "a dishonest explanation, a lie rather than an oddity or an error." *Kidwell*, 679 F.3d at 969 (citation and quotations omitted). Nothing in the record, taken as a whole, permits the inference that the Detention Center's stated reasons for imposing disciplinary sanctions on Muhammad, up to and including her termination, were dishonest explanations.

Muhammad contends that her firing rested entirely on the incidents described in the May 5 disciplinary record, and that two of those incidents could not have occurred as described because Muhammad was not at work on the dates the two incidents were alleged to have occurred. This is incorrect in two respects. First, Muhammad's own designated evidence (her time sheets for the relevant days) reveal that she was at work for two, not one, of the three dates reported.[12] Second, more importantly, in the context of

_____

[12] The first allegation was reported on April 29, 2014, a day Muhammad was not at work, describing Muhammad's conduct on April 27, 2014, a day Muhammad was at work. The second allegation was reported on April 30, 2014, a day Muhammad was not at work, describing Muhammad's conduct "on the date reported . . . ." Dkt. 57 Ex. K. The third allegation was reported on May 7, a day Muhammad was not at work, describing Muhammad's conduct on May 5, 2014, a day Muhammad was at work.

the Detention Center's progressive discipline policy, Muhammad's firing did not rest solely on the three incidents described in the May 5 disciplinary record. Rather, it was the culmination of two counselings, three written warnings, and two suspensions over the course of her five-year employment.

Muhammad disputes the accuracy of the factual bases for some (though not at all) of these sanctions, but that is not the material question. "[I]t is not relevant whether [the employee] actually was insubordinate [or otherwise violated her employer's policies]. All that is relevant is whether [her] employer was justified in coming to that conclusion." *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 799 (7th Cir. 1997); *Culver*, 416 F.3d at 547 ("[T]he issue before us is not whether an employer's evaluation of the employee was correct but whether it was honestly believed. . . . [It] can be 'foolish or trivial or even baseless' . . . ." (citation omitted)). Muhammad may be correct to attack the veracity of her supervisors' and colleagues' reports against her, but she does not point to any evidence that raises a reasonable inference that Detention Center staff did not honestly believe Muhammad to have violated Detention Center policy on those occasions when she was cited for doing so.

As to the May 5 disciplinary record specifically, the three allegations made therein are all supported by detailed accounts of Detention Center employees. Dkt. 57 Exs. J to L. It is true that one of the accounts purports to report conduct on a day on which Muhammad was not at work. *Id.* Ex. K. That account is therefore either a fabrication, or misdated. Muhammad points to no evidence suggesting that the Detention Center's

apparent rejection of the former conclusion indicates less than honest belief in the overall veracity of its contents.

In sum, Muhammad has not shown that the Detention Center's decision-maker on her firing had actual knowledge of the May charge before deciding to fire her. Even assuming the contrary, Muhammad has failed to point to evidence of a similarly situated employee receiving more favorable treatment or of pretextual grounds for her firing. The close temporal proximity of her firing to her filing the May charge, when put in context, raises no triable issue on its own. For these reasons, the Detention Center is entitled to judgment in its favor on Muhammad's Title VII retaliation claim.

## II.    ADA Discrimination

"The ADA prohibits employers from discriminating against disabled employees because of their disability." *Dickerson v. Bd. of Trs.*, 657 F.3d 595, 600 (7th Cir. 2011) (citing 42 U.S.C. § 12112(a)). As under Title VII, the interpretation of which guides interpretation of the ADA, *id.*, a plaintiff may make out a discrimination claim under the ADA by proceeding under the direct or indirect methods of proof. *Id.* at 601.

Under the indirect method, established, as noted above, by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *see Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016) (noting continuing viability), a plaintiff employee must first show a *prima facie* case of discrimination. *Dickerson*, 657 F.3d at 601. The burden of production then shifts to the employer to identify a nondiscriminatory reason for its treatment of the employee. *Id.* The burden then returns to the employee to show that the employer's reason is pretextual. *Id.*

The elements of the employee's *prima facie* case are that "(1) [s]he is disabled under the ADA; (2) [s]he was meeting [her] employer's legitimate employment expectations; (3) [s]he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably." *Id.* Here, the Detention Center does not contest that Muhammad was disabled within the meaning of the ADA during her employment at the Detention Center, or that Muhammad suffered an adverse employment action when she was fired. But the Detention Center denies that Muhammad was meeting its legitimate employment expectations, and that similarly situated but nondisabled persons were treated more favorably.

We agree with the Detention Center that Muhammad has not shown she was meeting its legitimate employment expectations. On this point, Muhammad incorporates her arguments on pretext under her Title VII retaliation claim. Pl.'s Br. Opp. 15 ("Th[e] argument [on legitimate employment expectations for] Plaintiff's *prima facie* case is often tied to the argument on pretext." (citing *Johnson v. City of Fort Wayne*, 91 F.3d 922, 936 (7th Cir. 1996)). For the reasons stated under Part I *supra*, however, in view of Muhammad's lengthy disciplinary history, and particularly the three incidents described in the May 5 disciplinary record, there is no evidence as would raise the inference that the Detention Center honestly believed Muhammad was meeting its employment expectations, and advanced her failure to do so only as a pretextual cover for an impermissible motive. Muhammad's *prima facie* case therefore fails on this element.

Moreover, for the reasons stated under Part I *supra*, we agree further with the Detention Center that Anderson, Muhammad's proffered comparator, was not in fact

treated more favorably than Muhammad. Muhammad's *prima facie* case therefore fails on this element as well.

Muhammad points to no other direct or circumstantial evidence as might further her claim under the direct method. *See Dickerson*, 657 F.3d at 601 ("Under the direct method, a plaintiff can present either direct or circumstantial evidence to meet [her] burden.") Accordingly, for Muhammad's failure to establish her case under either method of proof, the Detention Center is entitled to judgment as a matter of law on her ADA discrimination claim.

## Conclusion

For the reasons above, we conclude that no reasonable trier of fact could find for Muhammad on either of her claims on the basis of the record before us. Accordingly, the Detention Center is entitled to judgment as a matter of law, and its motion for summary judgment is therefore GRANTED.

Final judgment shall be entered by separate document. Fed. R. Civ. P. 58(a).

IT IS SO ORDERED.


Date:    12/7/2017

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Distribution to counsel of record via CM/ECF